**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. ______________

CITY OF DEARBORN HEIGHTS ACT 345 POLICE & FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

THE WHITEWAVE FOODS COMPANY,
DANONE S.A.,
JULY MERGER SUB INC.,
GREGG L. ENGLES,
JOSEPH S. HARDIN, JR.,
STEPHEN L. GREEN,
DOREEN A. WRIGHT,
MICHELLE GOOLSBY,
W. ANTHONY VERNON and
ANTHONY J. MAGRO,

Defendants.

---

**PLAINTIFF'S CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND VIOLATIONS OF §§14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

---

Plaintiff City of Dearborn Heights Act 345 Police & Fire Retirement System ("plaintiff"), individually and on behalf of all others similarly situated, respectfully brings this class action complaint for breach of fiduciary duty and violations of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder against the Defendants named herein and alleges the following:

**NATURE OF THE ACTION**

1. This is a stockholder class action on behalf of the public stockholders of The WhiteWave Foods Company ("WhiteWave" or the "Company"), a Delaware corporation, against WhiteWave, the members of WhiteWave's Board of Directors (the "Board"), Danone S.A., a *société anonyme* organized under the laws of France ("Parent"), and July Merger Sub Inc., a Delaware corporation and a direct or indirect wholly owned subsidiary of Parent ("Merger Sub," and with Parent, "Danone") for breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, and/or other violations of state and federal law arising out of their efforts to complete the sale of WhiteWave to Danone (the "Proposed Acquisition"). This matter arises out of Defendants' dissemination of a false and misleading proxy statement in violation of §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder, and the Board's breaches of their fiduciary duties owed to the Company's stockholders under state law.

2. On July 7, 2016, WhiteWave and Danone announced they had entered into an Agreement and Plan of Merger (the "Merger Agreement"). Pursuant to the Merger Agreement, and as the result of an unfair and conflicted process, WhiteWave stockholders will receive the unfair price of just $56.25 in cash for each share of WhiteWave they hold. The Merger Agreement provides that Merger Sub will merge with and into WhiteWave, with WhiteWave continuing as the surviving corporation and becoming a direct or indirect wholly-owned subsidiary of Parent (the "Merger").

3. To make matters worse, and in further breach of their fiduciary duties, Defendants caused WhiteWave and Danone to file with the SEC on July 29, 2016, a preliminary Joint Proxy Statement/Prospectus on Form S-4 (the "Proxy"). The Proxy, which recommended that WhiteWave stockholders vote in favor of the Proposed Acquisition, is materially deficient and deprives WhiteWave's stockholders of the basic information they require to make an intelligent, informed and rational decision about how to vote on the Proposed Acquisition. The Proxy fails to disclose all material information concerning the Proposed Acquisition and contains additional materially misleading statements. As detailed below in ¶¶62-66, and in contravention of §§14(a) and 20(a) of the 1934 Act and/or Defendants' fiduciary duty of disclosure under state law, the Proxy omits and/or misrepresents material information concerning, among other things, the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the Company's financial advisor.

4. As explained herein, this information is material to the impending decision of WhiteWave's stockholders whether or not to vote in favor of the Proposed Acquisition. As such, Defendants' violations of §§14(a) and 20(a) and their breaches of fiduciary duty under state law to maximize stockholder value and disclose all material information in connection with a merger transaction, threaten stockholders with irreparable harm for which money damages are not an adequate alternate remedy. Thus, Plaintiff seeks injunctive relief to ensure that Defendants cure their breaches of fiduciary duty and violations of §§14(a) and 20(a) before WhiteWave stockholders are asked to vote on the Proposed Acquisition, and that Defendants are not permitted to seek stockholder support of the Proposed Acquisition without complying with their duty under state law to maximize stockholder value and under the federal securities laws and state law to provide stockholders with all material information about the merger consideration, and the Company's intrinsic value, including critical data and inputs underlying the financial analyses supporting the fairness opinion of the Board's financial advisor.

5. In addition, by agreeing to the Proposed Acquisition, each of the Defendants has breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and/or has aided and abetted such breaches. Rather than acting in the best interests of the Company's stockholders, Defendants spent substantial effort tailoring the structural terms of the Proposed Acquisition to aggrandize their own personal interests and to meet the specific needs of Danone, which efforts will eliminate the equity interest of WhiteWaves' public stockholders.

6. In essence, the Proposed Acquisition is the product of a hopelessly flawed process and a false and misleading Proxy that are designed to ensure the merger of WhiteWave with Danone on terms preferential to Danone and Defendants, and detrimental to Plaintiff and WhiteWave's stockholders. Thus, as a result of Defendants' breaches of their fiduciary duties and their use of a false and misleading Proxy, if the Merger closes, Plaintiff and the members of the Class will be irreparably harmed.

7. On August 15, 2016, Defendants announced that the WhiteWave stockholder vote on the Proposed Acquisition will be held on October 4, 2016. Accordingly, time is of the essence.

8. Plaintiff seeks to enjoin the Proposed Acquisition.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over all claims asserted herein pursuant to §27 of the 1934 Act for violations of §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder. The Court also has jurisdiction over this action pursuant to 15 U.S.C. §78bb(f)(3)(A)(i), because it is a class action based on the statutory or common law of Delaware, Defendant WhiteWave's state of incorporation, and thus may be maintained in federal court. This Court has supplemental jurisdiction under 28 U.S.C. §1367.

10. Venue is proper in this District because WhiteWave has its principal place of business in this District at 1225 Seventeenth Street, Suite 1000, Denver, Colorado. Plaintiff's claims arose in

this District, where most of the actionable conduct took place, where most of the documents are electronically stored and where the evidence exists, and where virtually all the witnesses are located and available to testify at the jury trial permitted on these claims in this Court. Moreover, each of the Individual Defendants, as Company officers and/or directors, has extensive contacts with this District. Furthermore, Danone has extensive contacts in this District through the conduct alleged herein.

## PARTIES

11. Plaintiff City of Dearborn Heights Act 345 Police & Fire Retirement System is, and at all times relevant hereto was, a stockholder of WhiteWave.

12. Defendant WhiteWave is a publicly traded Delaware corporation headquartered in Denver, Colorado.

13. Defendant Parent is a *société anonyme* organized under the laws of France and headquartered in Paris, France. Parent operates in the United States through its wholly owned subsidiary The Dannon Company, Inc.

14. Defendant Merger Sub is a Delaware corporation and a direct or indirect wholly-owned subsidiary of Parent.

15. Defendant Gregg L. Engles is, and at all times relevant hereto was, Chairman, Chief Executive Officer ("CEO") and a director of WhiteWave.

16. Defendant Joseph S. Hardin, Jr. is, and at all times relevant hereto was, Lead Director of WhiteWave.

17. Defendant Stephen L. Green is, and at all times relevant hereto was, a director of WhiteWave.

18. Defendant Doreen A. Wright is, and at all times relevant hereto was, a director of WhiteWave.

19. Defendant Michelle Goolsby is, and at all times relevant hereto was, a director of WhiteWave.

20. Defendant W. Anthony Vernon is, and at all times relevant hereto was, a director of WhiteWave.

21. Defendant Anthony J. Magro is, and at all times relevant hereto was, a director of WhiteWave.

22. The Defendants named above in ¶¶15-21 are sometimes collectively referred to herein as the "Individual Defendants."

## THE PROPOSED ACQUISITION

**Background**

23. WhiteWave is a global company which generated $4 billion in sales in 2015 and has a portfolio of large and leading branded platforms in North America and Europe in high-growth, on-trend food and beverage categories which focus on Premium Organic Dairy, non-GMO,plant-based alternatives to milk & yogurt, Fresh Foods, and Coffee Creamers. WhiteWave has a successful track record of transforming categories and creating large scale brands.

24. WhiteWave's business includes highly recognized, category leading brands such as Silk®, So Delicious®, Vega™, Alpro®, Provamel®, Horizon Organic®, Wallaby Organic®, Earthbound Farm® and International Delight®. Since becoming a public company in 2012, WhiteWave sales have increased at a 19% compound annual growth rate through 2015, and WhiteWave has doubled its operating income during this period.

25. Danone is a leading global food company built on four business lines: Fresh Dairy Products, Early Life Nutrition, Waters and Medical Nutrition. Present in over 130 markets, Danone generated sales of €22.4 billion in 2015, with more than half in emerging countries. Danone's brand portfolio includes both international brands (Activia, Actimel, Danette, Danonino, Danio, evian, Volvic, Nutrilon/Aptamil and Nutricia) and local brands (Oikos, Prostokvashino, Aqua, Bonafont, Mizone, Blédina and Cow & Gate).

**The Company's Ongoing and Growing Success**

26. Recently WhiteWave has demonstrated its growing financial health and performance as a standalone business, as set forth in the chart below.



27. WhiteWave is not only a profitable growth company, but also holds a portfolio of leading brands. Its key leading brands include Silk, Vega, Alpro, So Delicious, Provamel, Wallaby Organic, International Delight, Horizon Organic and Earthbound Farm. WhiteWave has a portfolio of high-growth, on-trend food and beverage categories that focus mainly on premium organic dairy, non-GMO (genetically modified organisms), plant-based alternatives to milk and yogurt, coffee creamers and fresh foods.

28. On May 10, 2016, WhiteWave reported its financial results from operations for its first quarter 2016. WhiteWave reported total net sales of $1.04 billion for the three months ended March 31, 2016, a 14% increase from the same period of the prior year. WhiteWave also reported adjusted diluted earnings per share of $0.28 for the three months ended March 31, 2016, a 17% increase from the same period of the prior year. WhiteWave has beaten analyst estimates for adjusted earnings per share and adjusted net income for the past four quarters.

29. In commenting on these results, WhiteWave Chairman of the Board and CEO Engles stated: "We are off to a very good start in 2016, delivering results ahead of our expectations with healthy topline growth and operating performance. . . . Our strong start to the year has led us to increase our guidance for full year 2016."

30. On August 9, 2016, WhiteWave announced its financial results from operations for its second quarter of 2016. WhiteWave described its second quarter results as "strong" and reported the following highlights:

(a) reported and constant currency net sales increased 14%;

(b) reported operating income increased 31%; adjusted constant currency operating income increased 26% behind further operating margin expansion;

(c) reported diluted earnings per share increased 38% to $0.29; adjusted diluted earnings per share, excluding China joint venture investments, increased 24% to $0.32; and

(d) reiterated full year 2016 adjusted diluted earnings per share guidance of $1.38 to $1.41 and increased constant currency adjusted diluted earnings per share guidance to $1.43 to $1.46, excluding China joint venture investments.

31. In commenting on these results, Defendant Engles stated that: "We are pleased with the double-digit topline growth, continued strong margin expansion and robust earnings growth we generated in the second quarter and for the first half of 2016."

**The Proposed Acquisition Is Announced**

32. Despite WhiteWave's substantial year after year financial health and growth as a standalone, its portfolio of high-growth, on-trend food and beverage categories, and its increased guidance for full year 2016, the Board decided to sell the Company rather than pursue WhiteWave's excellent prospects as a standalone business. On July 7, 2016, WhiteWave and Danone announced that they had entered into the Merger Agreement, pursuant to which WhiteWave stockholders will receive just $56.25 in cash per WhiteWave share. Following the consummation of the Proposed Acquisition, WhiteWave will survive the Merger as a direct or indirect wholly-owned subsidiary of Parent.

33. The press release announcing the Proposed Acquisition states in pertinent part:

**Danone to Acquire WhiteWave, a USD 4 bn sales Global Leader in Organic Foods, Plant-based Milks and related products**

***Transaction price $56.25 per share in cash***

- A perfect match of vision, culture and businesses

- Creates a truly unique global leader strongly aligned with consumer trends for healthier and more sustainable eating and drinking options
- Significantly enhances Danone 2020 plan, serving the ambition for an *Alimentation* revolution
- Immediately accelerates Danone journey towards strong sustainable and profitable growth by 2020
- Doubles the size of Danone's US business
- Provides compelling value for WhiteWave's shareholders

***STRONG VALUE CREATION***

- High profitable growth in stable geographies
- Significant run-rate EBIT synergies of $300mln by 2020, representing 8% of WhiteWave 2015 sales and 80% of WhiteWave 2015 EBIT
- Strong value creation, solid EPS accretion in the first year after closing
- 100% debt financed
- Expected to maintain strong investment grade profile
- Closing expected by year end

. . . Danone and The WhiteWave Foods Company ("WhiteWave") today announced that they have entered into a definitive merger agreement under which Danone will acquire WhiteWave for $56.25 per share in an all-cash transaction, representing a total enterprise value of approximately $12.5 bn, including debt and certain other WhiteWave liabilities. The transaction has been unanimously approved by the Board of Directors of both companies. Its price represents a premium of approximately 24 percent over WhiteWave's 30-day average closing trading price ($45.43). The transaction is expected to close by the end of the year, subject to the approval of WhiteWave's shareholders, regulatory approvals, and customary conditions.

WhiteWave is a global company which generated $4 bn in sales in 2015 and has a portfolio of large and leading branded platforms in North America and Europe in high-growth, on-trend food and beverage categories which focus on Premium Organic Dairy, non-GMO, Plant-based alternatives to milk & yogurt, Fresh Foods, and Coffee Creamers. With a strong entrepreneurial spirit, WhiteWave has a successful track record of transforming categories and creating large scale brands. WhiteWave's business includes highly recognized, category leading brands such as Silk®, So Delicious®, Vega™, Alpro®, Provamel®, Horizon Organic®, Wallaby Organic®, Earthbound Farm® and International Delight®. Since becoming a public

company in 2012, WhiteWave sales have increased at a 19 percent compound annual growth rate through 2015, and WhiteWave has doubled its operating income during this period.

Together, WhiteWave and Danone will create a truly unique global leader committed to addressing tomorrow's consumer trends by providing healthy and sustainable eating and drinking options.

"At Danone, we constantly seek to align our vision of the world, our mission and our businesses: we believe we have a special responsibility, as expressed in our Manifesto, to help and support people in adopting healthier and more sustainable eating and drinking practices and constantly evolve our portfolio of brands and products to achieve this objective. To that extent, we found in WhiteWave the perfect alliance as we both believe in a healthier future and are conscious of our power to lead society forward", said **Emmanuel FABER**, Danone Chief Executive Officer. "This unique combination positions us better to address tomorrow's consumer trends and represents a great opportunity to step change the ambition of our plan for an Alimentation revolution and to accelerate our path towards strong sustainable and profitable growth by 2020. It will allow us to enhance Danone's growth profile and reinforce our resilience through a broader platform in North America. We are convinced that combining with WhiteWave will create significant value for all of our stakeholders."

**Franck RIBOUD**, Danone Chairman said: "I believe this acquisition advances Danone's mission and rich history of being at the forefront of emerging consumer trends and commitment to creating economic and social value. The Danone Board of Directors and Strategy Committee unanimously approved this transaction. We believe WhiteWave's size, positioning and geographical footprint fit perfectly with Danone's strategy and that it is the right transaction at the right time. The Danone Board will propose that shareholders approve the appointment of Gregg ENGLES, WhiteWave Chairman and Chief Executive Officer as a member of our Board upon completing the transaction as we pursue our ambitious vision together."

**Gregg ENGLES**, WhiteWave Chairman and Chief Executive Officer, said: "Today's announcement is an exciting next chapter for WhiteWave, bringing together two leading companies with a shared mission of changing the way the world eats for the better. We believe this is a compelling transaction that delivers significant cash value to our shareholders. Danone is a unique company with distinctive capabilities that will enable WhiteWave to reach its next phase of growth. Danone is a great cultural fit for our organization and I am excited for our employees to benefit from the opportunities presented by joining Danone, a leading global food company and the ideal strategic partner to support our future. I am pleased to be joining Danone's Board to assist with the exciting and unique journey combining our two companies."

**Strategic Benefits**

This transaction represents a key opportunity to enhance Danone's growth profile and enriches WhiteWave's opportunities. The strategic and financial benefits of Danone's acquisition of WhiteWave include:

- **Creating a leader strongly aligned with consumer trends for healthier and sustainable eating and drinking options:** WhiteWave is well positioned in high growth categories that are supported by strong secular trends. Organic foods and beverages and non-GMO plant-based alternatives to milk and yogurt are among the fastest growing categories in the industry. WhiteWave has been the fastest growing food and beverage company in the United States and one of the fastest growing in Europe for the past four years. In joining Danone, WhiteWave will have the opportunity to continue its industry-leading growth as part of a larger global company with substantial financial, geographic and operational resources. Upon closing the transaction, Danone will have one of the most extensive portfolios of brands and products in fresh dairy, organic foods and beverages and plant-based alternatives to milk & yogurt.

- **Building a stronger North America platform:** This transaction further diversifies Danone's portfolio and broadens its presence in North America. The transaction will create a leading U.S. refrigerated dairy player, as well as one of the top 15 largest U.S. Food and Beverage manufacturers. Following the closing of the transaction, Danone's North America footprint would increase from 12 to 22 percent of Danone's total portfolio.

- **Driving strong value and delivering attractive financial benefits.** By building on its resources, scale, distinctive R&D and marketing capabilities, and route to market expertise especially in the chilled category, Danone will have significant opportunities to support WhiteWave's continued growth while also realizing significant sales growth and cost synergies. Danone expects the transaction to be solidly accretive to Danone's earnings within the first year after closing and to be above 10 percent accretion based on expected run-rate synergies. The transaction is expected to result in approximately $300mn of EBIT synergies by 2020.

**Management and Governance**

After the closing of the transaction, Danone will submit to its shareholders a resolution appointing Mr. Gregg ENGLES, to the Danone Board of Directors.

WhiteWave and Danone uniquely share common business values and a vision for providing people healthier foods and beverages. Following the closing of the transaction, Danone and WhiteWave expect to combine their U.S. activities into a Public Benefit Corporation. This commitment is in line with Danone's long term mission for building economic and social value.

Danone and WhiteWave will establish a team to prepare for and to oversee the transition of the businesses.

**Path to Completion**

> The transaction, which is expected to close by the end of the year, is subject to WhiteWave shareholders' approval, receipt of required regulatory approvals, including in the European Union and the United States and other customary closing conditions.
>
> The acquisition of WhiteWave is expected to be fully financed with debt for which Danone has received commitments from its banks.
>
> Danone expects to maintain a strong investment grade rating.

**Disabling Conflicts Infect the Process**

34. The process leading to the Proposed Acquisition was infected with conflicts. The Proposed Acquisition is the product of a hopelessly flawed process that is designed to ensure the sale of WhiteWave to Danone on terms preferential to Danone, the Individual Defendants and WhiteWave insiders, and to subvert the interests of Plaintiff and the other WhiteWave stockholders of the Company.

35. The Proposed Acquisition is being driven by members of the Board and Company management who collectively control an illiquid block of over 10.8 million shares of WhiteWave common stock (approximately 6.1% of WhiteWave's outstanding shares), and seek liquidity or other special benefits for their illiquid holdings. The Proposed Acquisition offers that liquidity and if it closes, members of the Board and Company management will receive ***over $612 million*** from the sale of their illiquid WhiteWave holdings.

36. An activist investor using public activism to leverage a higher return on its investment also pressured the Board to sell the Company. Hudson Executive Capital ("Hudson Executive") took a position in WhiteWave shares late last year and continued to build on that investment, reaching a $32 million stake in the Company as of the end of March, according to data from S&P Capital IQ.

37. Then during the last few months, Hudson Executive bankers urged Defendant Engles to solicit potential buyers, believing that WhiteWave would make a natural acquisition target for food giants like Coca-Cola or PepsiCo, according to a person briefed on the matter who asked not to be identified. WhiteWave's faster growth and higher multiple could have been tempting to the likes of General Mills as well. In the meantime, Hudson Executive – which was familiar with many of the potential bidders – sought to chum the waters on its own, trying to stir up interest from potential buyers.

38. Hudson Executive's efforts proved fruitful, as the Board capitulated and agreed to sell the Company by Danone. For the activist firm, the Proposed Acquisition will yield an estimated 45% gain for Hudson Executive.

39. In addition, WhiteWave's officers and directors will receive millions of dollars in special payments not being made to ordinary stockholders from the Proposed Acquisition. From the Proposed Acquisition, WhiteWave's officers and directors will receive millions of dollars in special payments for currently unvested stock options, performance units and restricted shares, all of ***which shall, upon the Proposed Acquisition's closing, become fully vested and exercisable***. The Company's senior management is also entitled to receive from the Proposed Acquisition approximately ***$78 million in change-of-control payments***. Thus, the Board is conflicted and serving its own financial interests rather than those of WhiteWave's other stockholders.

40. Furthermore, Danone has agreed as part of the Proposed Acquisition to nominate to the Danone board WhiteWave Chairman and CEO Defendant Engles.

**The Flawed and Conflicted Process**

41. At the outset of discussions between Danone and WhiteWave in March 2016, Danone told the Company it would not participate in a process involving multiple parties for an acquisition of WhiteWave if the WhiteWave Board determined to pursue such a path. In breach of its fiduciary duties to WhiteWave's stockholders, the Board accepted this limitation and pursued negotiations with Danone concerning the sale of the Company.

42. Over the next several months, the Board repeatedly declined the opportunity to open the sales process in order to create an auction for the Company. Instead, the Board capitulated to Danone's demands and throughout the process granted Danone ***de facto*** exclusivity.

43. Thus, without conducting either a pre- or post-signing check of market interest in an acquisition of WhiteWave, the Board accepted, in breach of its fiduciary duties to the Company's stockholders, the unfair price of $56.25 in cash per WhiteWave share to sell the Company to Danone.

**The Conflicted and Unfair Process Led to an Unfair Price**

44. The Board is obligated by fiduciary duty to maximize the value received by WhiteWave's stockholders in a change-of-control transaction. That maximized value must reflect WhiteWave's financial performance and prospects. But the Board agreed to sell WhiteWave to Danone at a price that does not reflect WhiteWave's financial performance and prospects.

45. The unfair and conflicted process has resulted in an unfair price for WhiteWave stockholders. The proposed per share price of WhiteWave common stock is $56.25 in cash, which represents a premium of just 23.1% based on WhiteWave's average one month closing. This premium is significantly below the average one month premium of nearly 70.03% for comparable

transactions within the past three years. Further, the $56.25 merger consideration is below the target price of $58.00 set by analysts at Susquehanna Financial and Argus Research Corporation on May 10, 2016, and August 12, 2015, respectively.

46. Moreover, the $56.25 per share merger consideration for WhiteWave shares drastically undervalues the Company and its prospects. Given WhiteWave's substantial year after year financial health and growth as a standalone, its portfolio of high-growth, on-trend food and beverage categories, and its increased guidance for full year 2016, the Proposed Acquisition price is both inadequate and unfair.

47. Further, the merger consideration fails to reflect WhiteWave's value to Danone. The market research firm Packaged Facts, Rockville, Maryland., estimates the U.S. retail market for natural and organic foods and beverages will reach $87 billion in 2019, up from $53 billion in 2014. Packaged Facts estimates dairy products, including milk and milk alternatives, yogurt, ice cream, eggs, and cheese, comprise 30% of natural and organic food retail sales. This is second only to fresh produce with 35% of the market. Beverages, including coffee, tea, juices and soft drinks, come in third with 15% of sales. With the acquisition, Danone will not only control a sizable share of the U.S. market, but the company is now even more formidable when competing with other European food giants, namely Nestle and Unilever, on a global scale, according to Packaged Facts. Danone also gains entry into the plant-based foods and beverages category, which itself is a prime growth category.

48. The deal between Danone and WhiteWave will create a global company that will be strongly associated with changing consumer preferences toward healthier eating and drinking options. Data from industry tracker Euromonitor indicates that the deal will push Danone into the

ranks of the top 15 U.S. food and beverage companies. And even as the total volume of milk sold in U.S. retail between 2010 and 2015 has declined by 13%, organic milk has increased by 22.5%, according to Euromonitor. WhiteWave's Horizon is not only the biggest branded milk in the overall U.S. milk market with 5.4% share, according to Euromonitor, but it has nearly 25% of the organic milk market.

49. Moreover, Cecile Canais, chief financial officer of Danone, said the company is projecting $300 million in synergies at the EBIT level on an annual basis. "From these synergies, 75% are cost synergies," she said. "And of this 75%, 85% will be in the U.S. The cost synergies will basically be the results of efficiencies created through the combination, by scaling sourcing and supply chain and fixed cost optimization. In addition there will be revenue synergies, driven by the acceleration of existing platforms, as well as the leverage of R&D capabilities to support innovations."

50. In the announcement of the Proposed Acquisition, Franck Riboud, Danone Chairman, said: "I believe this acquisition advances Danone's mission and rich history of being at the forefront of emerging consumer trends and commitment to creating economic and social value. The Danone Board of Directors and Strategy Committee unanimously approved this transaction. We believe WhiteWave's size, positioning and geographical footprint fit perfectly with Danone's strategy and that it is the right transaction at the right time."

51. Furthermore, while the Board's financial advisor Goldman Sachs & Co. ("Goldman Sachs") provided the Board with a fairness opinion, the analyses supporting that fairness opinion are flawed. Goldman Sachs implicitly acknowledged the lack of reasonably comparable public peers by omitting a selected public companies analysis from its fairness opinion. Goldman Sachs did,

however, include a flawed selected transactions analysis that significantly understates WhiteWave's value due to three main issues:

(a) First, most of the targets Goldman Sachs considered are not reasonably comparable to WhiteWave. None are exclusively selling branded plant-based foods and beverages like WhiteWave. Most also operate within slow-growth segments of the food and beverage industry in contrast to the fast-growth exhibited by WhiteWave's niche. Thus, the observed multiples are of questionable veracity when determining WhiteWave's value.

(b) Second, Goldman Sachs mechanically applied the full range of lowest to highest observed multiples to arrive at its indications of value, thereby significantly undervaluing the Company. A proper market approach involves the identification of only the most comparable companies from which to select valuation multiples. The most comparable companies are identified by similar core product offerings and a benchmarking of their operating metrics against the identified peers. Given WhiteWave's fast growth and above average gross profit margins, it would only be appropriate to select above average multiples or even those near the high end of the range.

(c) Third, like many fast-growing enterprises, WhiteWave exhibits higher than average current SG&A expenses relative to its current revenue base. These operating expenses, which can support a much larger operation, offer the potential for significant future margin expansion due to their fixed nature (*i.e.,* positive operating leverage). As such, any market approach using near-term valuation multiples should either (i) normalize WhiteWave's current profit margins before applying valuation multiples or (ii) rely on multiples of revenue rather than multiples of profit. These corrections would result in significantly higher indications of value for WhiteWave.

52. To compound the problem, Goldman Sachs' *Discounted Cash Flow Analysis* ("DCF") is also flawed. Cash flows are central to corporate valuation. Ultimately, a stockholder's decision to accept or decline a proposed transaction hinges on the value of the proposed consideration in comparison to the value of expected future cash flows of retaining his or her shares. Here Goldman Sachs' DCF is flawed and the Forecasts (defined in the Proxy to include Management's Forecasts and Extrapolations) on which it relies are unusual in several respects:

(a) The implied terminal EBITDA multiples resulting from Goldman Sachs' analysis of 7.9x-14.0x are too low. This is best exemplified in comparison with the observed 12.1x-23.7x EBITDA multiples of targets operating in mature, slow-growth segments of the food and beverage industry in Goldman Sachs' *Selected Transactions Analysis*. Even if one assumes that WhiteWave's niche has matured by 2026 in a way that makes it comparable at that point to the targets in Goldman Sachs' transactions analysis, Goldman Sachs' DCF understates WhiteWave's terminal value by billions of dollars.

(b) The Forecasts indicate surprisingly low free cash flow conversion over the forecast period (*e.g.*, as low as 13% versus WhiteWave's 22% LTM conversion rate). This is due to the forecasted capital expenditures, working capital adjustments, and other cash flow impacts that are not disclosed.

(c) The Forecasts suggest a near-term, significant moderation in WhiteWave's revenue growth from the mid-teens exhibited since 2009 to only 7%-8% through 2020. This slow down in growth has a significant impact on the DCF values.

(d) Although the Forecasts contemplate some operating leverage, with EBITDA margins expanding from 14% to 21% in a decade (an average of 0.7% per year), the extent to which

that leverage results from fixed SG&A costs and/or gross profit margin expansion is unknown without further disclosure. There is a reasonable likelihood that WhiteWave's out-year margins could expand faster given its out-sized current SG&A spend. For example, WhiteWave's SG&A as a percentage of revenues has already declined by nearly 4% in just the last four years alone (an average of 1% per year). Any additional operating leverage would significantly increase the DCF values.

53. In short, WhiteWave's prospects are excellent and growing. But rather than pursue the Company's current strategy, with its strong prospects, the Board agreed, for its own interests and the interests of the WhiteWave stockholders, to sell WhiteWave on the cheap, ignoring its duty to maximize stockholder value.

**Preclusive Deal Protection Devices**

54. In addition, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Acquisition a *fait accompli* and ensure that no competing offers will emerge for the Company.

55. To protect against the threat of alternate bidders out-bidding Danone after the announcement of the Proposed Acquisition, Defendants implemented preclusive deal protection devices to guarantee that Danone will not lose its preferred position. These deal protection devices effectively preclude any competing bids for WhiteWave.

56. The Merger Agreement includes a number of provisions to discourage any topping bids for WhiteWave. These include a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by Danone.

57. Moreover, pursuant to the Merger Agreement, in the event an unsolicited bidder submits a competing proposal, the Company must notify Danone of the bidder's identity and the terms of the bidder's offer. Thereafter, should the Board determine that the unsolicited offer is superior, before the Company can terminate the Merger Agreement with Danone in order to enter into the competing proposal, it must negotiate in good faith with Danone (if Danone so desires) and allow Danone to amend the terms of the Merger Agreement to make a counter-offer that WhiteWave must consider in determining whether the competing bid still constitutes a superior proposal.

58. In addition, the Merger Agreement grants Danone information rights that require WhiteWave to share highly sensitive information about competing proposals with Danone. In other words, the Merger Agreement gives Danone access to any rival bidder's information and allows Danone a free right to top any superior offer simply by matching it. Accordingly, no rival bidder is likely to emerge and act as a stalking horse because the Merger Agreement unfairly assures that any "auction" will favor Danone and piggy-back upon the due diligence of the foreclosed second bidder.

59. Finally, the Merger Agreement provides that WhiteWave must pay Danone a ***$310 million*** termination fee if the Company decides to pursue a competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide the Company's stockholders with a superior offer.

60. Ultimately, these preclusive deal protection devices illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written ***bona fide*** proposal for an alternative acquisition that constitutes or would

reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

61. Thus, the Merger Agreement's preclusive deal protection devices present a substantial and significant bar to the possibility of a topping bid.

**The False and Misleading Proxy**

62. In order to encourage and obtain stockholder support for the deal, Defendants filed and disseminated to stockholders the materially misleading Proxy. The Proxy, which recommends that WhiteWave's stockholders vote in favor of the Proposed Acquisition, omits and/or misrepresents material information about the unfair sales process, the unfair consideration, and the true intrinsic value of the Company. The Proxy is materially deficient and deprives WhiteWave stockholders of the basic information they require to make an intelligent, informed and rational decision about whether to vote for or against the Merger. Specifically the Proxy omits/or misrepresents the material information set forth below in contravention of §§14(a) and 20(a) of the 1934 Act and/or Defendants' duty of candor and full disclosure under state law.

63. Defendants made several materially misleading statements or otherwise failed to disclose material information in the Proxy about critical data and inputs underlying the financial analyses supporting the fairness opinion of the Board's financial advisor Goldman Sachs, including:

(a) with respect to a *Selected Publicly Companies Analysis*, whether Goldman Sachs considered or performed such analysis;

(b) with respect to Goldman Sachs' *Illustrative Present Value of Future Share Price Analysis*:

(i) the basis for Goldman Sachs' application of a NTM EPS multiple range of 18.8x-28.8x;

(ii) the basis for Goldman Sachs' application of an NTM EBITDA multiple range of 11.8x-15.5x; and

(iii) individual inputs and assumptions utilized by Goldman to derive WhiteWave's estimated cost of equity of 10.0%;

(c) with respect to Goldman Sachs' *Selected Transactions Analysis*:

(i) the individual EV/LTM Adj. EBITDA multiples for each of the selected transactions;

(ii) adjustments, if any, that were made to the observed target EBITDAs; and

(iii) whether Goldman Sachs performed any type of benchmarking analysis for WhiteWave in relation to the selected transactions;

(d) with respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis*, the individual inputs and assumptions utilized by Goldman Sachs to derive WhiteWave's weighted average cost of capital as 7.5% to 9.5%;

(e) the financial projections by WhiteWave management and relied upon by Goldman Sachs for purposes of its analysis, for fiscal years 2016 - 2026, for the following items:

(i) Gross profit (or cost of goods sold);

(ii) G&A;

(iii) Taxes (or Tax Rate);

(iv) Capital expenditures;

(v) Changes in net working capital;

(vi) Stock-based compensation expense; and

(vii) Any other adjustments to unlevered free cash flow.

64. There is no more material information to stockholders in a merger than the information underlying or supporting the purported "fair value" of their shares. Stockholders are entitled to the information necessary to inform a decision as to the adequacy of the merger consideration, which includes the ***underlying data*** (including management's projections) the investment bankers relied upon, the ***key assumptions*** that the financial advisors used in performing valuation analyses, and the range of values that resulted from those analyses. Here, the analyses Goldman Sachs incorporated certain critical assumptions that significantly affect the output (valuation) of the analyses. Without this material information, stockholders have no basis on which to judge the adequacy of Danone's offer.

65. Without full and fair disclosure of the material information set forth above, stockholders should not be asked to vote on the Proposed Acquisition.

66. As explained above, this information is material to the impending decision of WhiteWave's stockholders whether or not to vote in favor of the Proposed Acquisition. As such, Defendants' violations of §§14(a) and 20(a) of the 1934 Act and their breaches of fiduciary duty under state law to maximize stockholder value and disclose all material information in connection with a merger transaction threaten stockholders with irreparable harm for which money damages are not an adequate alternate remedy. Thus, Plaintiff seeks injunctive relief to ensure that Defendants cure their breaches of fiduciary duty and violations of §§14(a) and 20(a) before WhiteWave stockholders are asked to vote on the Proposed Acquisition, and that Defendants are not permitted to seek stockholder support of the Proposed Acquisition without complying with their duty under state law to maximize stockholder value and under the federal securities laws and state law to provide

stockholders with all material information about the merger consideration, and the Company's intrinsic value, including critical data and inputs underlying the financial analyses supporting the fairness opinion of the Board's financial advisor.

67. By agreeing to sell WhiteWave to Danone at an unfair price, Defendants have breached their fiduciary duties of loyalty, due care, independence, good faith and fair dealing, and/or have aided and abetted such breaches by the Board. As a result of the Board's breaches, the Proposed Acquisition consideration for each WhiteWave share does not fairly value WhiteWave and its prospects. WhiteWave stockholders stand to be deprived of the true value of their shares.

68. Unless enjoined by this Court, Defendants will complete the sale of WhiteWave to Danone, and Plaintiff and the other WhiteWave stockholders will forever lose their equity interest in the Company for an inadequate price, all to the irreparable harm of Plaintiff and the other stockholders of WhiteWave.

69. Plaintiff seeks to enjoin the Proposed Acquisition.

## CLASS ACTION ALLEGATIONS

70. Plaintiff brings this action individually and as a class action on behalf of all holders of WhiteWave common stock who are being and will be harmed by Defendants' actions described herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

71. This action is properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

72. The Class is so numerous that joinder of all members is impracticable. According to the Merger Agreement, there are more than 177 million shares of WhiteWave common stock issued and outstanding.

73. There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

(a) whether the federal securities laws have been violated by Defendants' acts as alleged herein;

(b) whether the Proxy contains material misrepresentations or omissions;

(c) whether Defendants have breached their fiduciary duties of undivided loyalty, independence, or due care with respect to Plaintiff and the other members of the Class, or have aided and abetted therein;

(d) whether Defendants have engaged in self-dealing, or have aided and abetted therein;

(e) whether Defendants have breached their fiduciary duty to secure and obtain the best value reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Acquisition, and/or have aided and abetted therein;

(f) whether Defendants have unjustly enriched themselves and other insiders or affiliates of WhiteWave;

(g) whether Defendants have breached any of their other fiduciary duties owed to Plaintiff and the other members of the Class in connection with their failure to maximize stockholder value, including the duties of good faith, diligence, candor and fair dealing, or have aided and abetted therein;

(h) whether Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets, or have aided and abetted therein;

(i) whether Defendants have failed to disclose material information to stockholders in connection with the Proposed Acquisition;

(j) whether the compensation payable in connection with the Proposed Acquisition to Plaintiff and the Class is unfair and inadequate; and

(k) whether Plaintiff and the other members of the Class will suffer irreparable injury if the transaction complained of herein is consummated.

74. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

75. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

76. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class.

77. Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

78. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

**COUNT I**

**Claim for Breach of Fiduciary Duties Against the Individual Defendants**

79. Plaintiff repeats and realleges each allegation set forth herein.

80. The Individual Defendants have violated fiduciary duties of care, loyalty, candor, good faith and independence owed to the public stockholders of WhiteWave and have acted to put their personal interests ahead of the interests of WhiteWave stockholders.

81. By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are acting to unfairly deprived plaintiff and other members of the Class of the true value inherent in and arising from WhiteWave.

82. By entering into the Proposed Acquisition without regard to the fairness of the transaction to the Company's stockholders, the Individual Defendants have knowingly and recklessly and in bad faith violated their fiduciary duties.

83. As demonstrated by the allegations above, the Individual Defendants knowingly or recklessly failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the stockholders of WhiteWave because, among other reasons, they failed to:

(a) ensure a fair process;

(b) properly maximize the value of WhiteWave common stock;

(c) act in the best interest of WhiteWave's stockholders; and

(d) guard against the numerous conflicts of interest presented by the Proposed Acquisition.

84. Because the Individual Defendants dominate and control the business and corporate affairs of WhiteWave, and are in possession of private corporate information concerning WhiteWave's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of WhiteWave that makes it inherently unfair for the Individual Defendants to pursue the Proposed Acquisition at an unfair price, to the exclusion of maximizing stockholder value.

85. By reason of the foregoing acts, practices and course of conduct, the Individual Defendants failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

86. As a result of the Individual Defendants' actions, Plaintiff and the Class will be harmed.

87. The Individual Defendants are engaging in self-dealing, are not acting in good faith toward Plaintiff and the other members of the Class, and have breached and are breaching their fiduciary duties to the members of the Class.

**COUNT II**

**Claim for Aiding and Abetting Breaches of Fiduciary Duty Against Parent and Merger Sub**

88. Plaintiff repeats and realleges each allegation set forth herein.

89. The Individual Defendants owe to Plaintiff and the members of the Class certain fiduciary duties as fully set out herein.

90. By committing the acts alleged herein, the Individual Defendants have breached and are breaching their fiduciary duties owed to Plaintiff and the members of the Class.

91. Parent and Merger Sub are colluding in or aiding and abetting the Individual Defendants' breaches of fiduciary duties, and are active and knowing participants in the Individual Defendants' breaches of fiduciary duties owed to Plaintiff and the members of the Class.

92. Defendants Parent and Merger Sub are participating in the breaches of the fiduciary duties by the Individual Defendants for the purpose of advancing their own interests. Defendants Parent and Merger Sub will obtain both direct and indirect benefits from colluding in or aiding and abetting the Individual Defendants' breaches.

93. Plaintiff and the other members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

**COUNT III**

**Against the Individual Defendants and WhiteWave for Violations of §14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder**

94. Plaintiff repeats and realleges each allegation set forth herein.

95. During the relevant period, the Individual Defendants and WhiteWave disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

96. The Proxy was prepared, reviewed and/or disseminated by the Individual Defendants and WhiteWave. It misrepresented and/or omitted material facts, including material information about the merger consideration, and the Company's intrinsic value, including critical data and inputs underlying the financial analyses supporting the fairness opinion of the Board's financial advisor.

97. In disseminating the Proxy, the Individual Defendants and WhiteWave made misleading statements of material facts and omitted to state material facts necessary to make the statements made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder. By virtue of their positions within the Company or as signatories to the Merger Agreement, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy.

98. The Individual Defendants and WhiteWave were at least negligent in filing the Proxy with these materially false and misleading statements.

99. The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Acquisition. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

100. By reason of the foregoing, the Individual Defendants and WhiteWave violated §14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

101. Because of the false and misleading statements in the Proxy, Plaintiff is threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

## COUNT IV

### Against the Individual Defendants, Parent and Merger Sub for Violation of §20(a) of the 1934 Act

102. Plaintiff repeats and realleges each allegation set forth herein.

103. The Individual Defendants acted as controlling persons of WhiteWave within the meaning of §20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of WhiteWave and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the

power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends were false and misleading.

104. Each of the Individual Defendants, Parent and Merger Sub was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

105. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same. The Proxy at issue contained the unanimous recommendation of each of the Individual Defendants to approve the Proposed Acquisition. They were thus directly involved in the making of this document.

106. Parent and Merger Sub also had direct supervisory control over composition of the Proxy and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy.

107. Section 6.6(a) of the Merger Agreement provides for the participation of Defendants Parent and Merger Sub in the preparation, filing and distribution of the Proxy:

> Parent shall cooperate with the Company in the preparation of the Proxy Statement and furnish all information concerning Parent and Merger Sub that is required in connection with the preparation of the Proxy Statement.

108. The Proxy purported to describe the various issues and information that they reviewed and considered, descriptions which had input from both the directors and Danone.

109. By virtue of the foregoing, the Individual Defendants, Parent and Merger Sub violated §20(a) of the 1934 Act.

110. As set forth above, the Individual Defendants, Parent and Merger Sub had the ability to exercise control over and did control a person or persons who violated §14(a) and SEC Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to §20(a) of the 1934 Act. As a direct and proximate result of Defendants' conduct, WhiteWave's stockholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, as follows:

A. Declaring that this action is properly maintainable as a class action;

B. Declaring and decreeing that the Proposed Acquisition was entered into in breach of the fiduciary duties of the Defendants and is therefore unlawful and unenforceable;

C. Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until they comply with their fiduciary duties of loyalty, good faith, care and candor and to maximize stockholder value and fully and disclose all material information in their possession under state law, and their duties to provide stockholders with all material information about the merger consideration and the Company's intrinsic value, including critical data and inputs underlying the financial analyses supporting the fairness opinion of the Board's financial advisor, under §§14(a) and 20(a) of the 1934 Act;

D. Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until the Company adopts and implements a procedure or process to obtain the highest possible price for stockholders;

E. Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of WhiteWave's stockholders;

F. Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof;

G. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

H. Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED this 19th day of September, 2016.

Respectfully submitted,

EVANS & MCFARLAND, LLC

By: s/ M. Gabriel McFarland
M. Gabriel McFarland
Evans & McFarland, LLC
910 13th St., #200
Golden, CO 80401
Telephone: 303.279.8300
Facsimile: 303.277.1620
Email: gmcfarland@emlawyers.com

ROBBINS GELLER RUDMAN & DOWD LLP
Randall J. Baron
David T. Wissbroecker
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619.231.1058
Facsimile: 619.231.7423

ATTORNEYS FOR PLAINTIFF

# CERTIFICATION OF NAMED PLAINTIFF
# PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF DEARBORN HEIGHTS ACT 345 POLICE & FIRE RETIREMENT SYSTEM ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: plaintiff holds 6,575 shares of WhiteWave stock as of August 25, 2016 and was a holder of WhiteWave at all relevant times.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Kumar v. Santander Consumer USA Holdings Inc., et al.*, No. 3:14-cv-03746 (N.D. Tex.)

6. The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 31st day of August, 2016.

CITY OF DEARBORN HEIGHTS ACT 345
POLICE & FIRE RETIREMENT SYSTEM

By: [signature]

Its: Trustee

WHITEWAVE